# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,        )
                               )        2:11-cr-00216-PMP-LRL
v.                             )
                               )        MOTION TO SUPPRESS (#8)
BRYAN J. EGAN,                  )
                               )
              Defendant.        )
_____)

# REPORT & RECOMMENDATION

Before the court is defendant Bryan J. Egan's Amended Motion to Suppress (#8).  The government filed an Opposition (#11), and the defendant filed a Reply (#13).  An evidentiary hearing was conducted on September 8, 2011.  Defendant Egan and Special Agent (SA) E.J. McEwen of the FBI testified at the hearing.  Following the hearing, Egan and the government submitted supplemental memoranda of points and authorities.  (#16 and #17).

Egan is awaiting trial on charges of wire fraud and bank fraud.  He seeks an order suppressing (1) incriminating statements he made to FBI agents, and (2) the fruits of the agents' search of his external hard drive, all while he was incarcerated on unrelated charges in a federal detention facility.  In his motion, Egan contends that the agents failed to advise him of his *Miranda* rights, and that his statements and his purported consent to the search of the hard drives were given involuntarily.  During oral argument following the evidentiary portion of the hearing, a third potential basis for a suppression order emerged: Egan's statements and consent to search were obtained as a direct result of the ineffective assistance of counsel rendered by his then attorney, James Hartsell.

. . .

## BACKGROUND

In 2001, Egan pled guilty to bank fraud in an unrelated case (Case No. 01-cr-240-KJD-PAL), and was sentenced to 63 months in custody, followed by five years of supervised release. He was released from custody and placed on supervision in 2006. In March, 2010, the U.S. Probation Office believed that Egan was engaging in new criminal conduct, and petitioned the court to revoke his supervised release. Egan was arrested, and on March 31, 2010 made his initial appearance on the petition. The court detained Egan and appointed the Federal Public Defender's Office to represent him. After the supervised release revocation hearing was continued twice pursuant to stipulation, the court on August 19, 2010, at Egan's request, relieved the Federal Public Defender's Office and appointed James Hartsell, a CJA panel attorney. The revocation hearing was rescheduled for November 9, 2010 to give Hartsell adequate time to prepare. It was continued once again to December 21, 2010.

At the September 8, 2011 evidentiary hearing in this case, Egan testified that when Hartsell was appointed, he assured Egan that a private investigator would visit him in the jail to discuss the allegations in the revocation petition. Despite numerous phone calls to Hartsell's office, Egan spoke to Hartsell only once, and as of early December, 2010, had not seen the private investigator. At some point during 2010, Egan's wife informed him that he was being investigated by the federal grand jury regarding the alleged unlawful conduct that formed the basis for his revocation proceeding. Approximately one week before the upcoming December 21 revocation hearing, Egan, having had virtually no contact with Hartsell, wrote a letter to the court asking for new counsel. Shortly after he wrote the letter, a private investigator came to the detention facility to speak with him. Egan asked the investigator why he hadn't visited him sooner. The investigator explained that he'd been hired only a few days ago, and that this was the earliest meeting he could arrange. The investigator also told Egan that he couldn't really provide any assistance to him because there wasn't enough time before the scheduled hearing, which, according to the investigator, could not be continued again. Apparently feeling helpless

2

because he had no evidence to support a defense, Egan told the investigator to inform Hartsell that he would admit to the violations.

On December 13, 2010, Hartsell sent an e-mail to Assistant U.S. Attorney (AUSA) Daniel Schiess, notifying him that "Egan [would] stipulate to all of the violations as long as he retain[ed] the right to argue the outcome." (#11-1 Exhibit A). Additionally, Hartsell stated that Egan "would like a chance to meet with [Mr. Schiess] following the hearing regarding the...allegations" that were the subject of the grand jury investigation. *Id.* At the revocation hearing on December 21, 2010, Egan was provided with amendments to the original revocation petition. Because Egan had not received a copy of the amendments from Hartsell prior to the hearing, the court took a recess to give Egan a chance to review them. When the court reconvened, it canvassed Egan regarding the letter he'd written about Hartsell's inadequate performance. The court construed the letter as a motion to appoint new counsel, which it wished to address before imposing sentence. Egan decided, however, to withdraw the motion and to proceed with Hartsell as his counsel. The court sentenced Egan to 36 months in prison, the maximum allowed by statute.

Immediately following the hearing, at Egan's request, AUSA Schiess, AUSA Sarah Griswald, Hartsell, Egan, and SA McEwen met in the U.S. Marshals' lock-up to discuss the allegations being investigated by the grand jury. The prosecutors and SA McEwen sat across from Egan during the meeting, while Hartsell stood a few feet away in the corner of the room. Egan and the government engaged in plea negotiations with a view toward securing Egan's cooperation in return for a sentencing benefit. In a later email,[1] Hartsell acknowledged that during the meeting, "Egan and the USA did all the talking," and that he (Hartsell) was "not involved in the negotiations." (#8-2). When asked whether he represented Egan at that time,

---

[1] Several months later, attorney Chris Rasmussen, who represents Egan in this case, exchanged emails with Hartsell in an effort to determine whether grounds existed for the motion to suppress that Rasmussen ultimately filed. The emails between Hartsell and Rasmussen quoted here are those in which Rasmussen was attempting to tap Hartsell's memory of the circumstances of his representation of Egan.

Hartsell explained in the email to Rasmussen (#8-2) that, in his mind, "technically [he] was done" after the hearing was over.[2]  The only active involvement Hartsell had in the meeting occurred when the prosecutors and the agent stepped out of the room briefly to discuss the sentence they would agree to recommend if Egan were to plead guilty to new charges.  At that point, Egan asked Hartsell what his thoughts were on the deal.  Hartsell said it was the best he thought Egan would be able to get.  That was full extent of the advice or other assistance Hartsell provided to Egan that day.  When the prosecutors and the agent returned to the interview room, they provided Egan with a "number" that represented the number of months of imprisonment they would recommend to the sentencing judge.  Nothing was in writing, but it was understood by Egan and Hartsell that the government's "number" was contingent upon Egan meeting with SA McEwen in the near future and making a complete and truthful proffer regarding his own involvement and the involvement of others in the criminal activities that were under investigation.  When the meeting was over, Hartsell left the building without further discussion with Egan.  Despite knowing that Egan would soon be interviewed by FBI agents concerning his and his associates' criminal activities, Hartsell said nothing to Egan, the AUSAs, or SA McEwen, about a written *Kastigar*[3] letter from the government promising Egan that nothing he said during the proffer could later be used against him if a plea agreement were not reached.

On January 3, 2011, just two days before SA McEwen was scheduled to obtain a proffer from Egan, Schiess e-mailed a copy of the proposed plea agreement and criminal information

---

[2]  Nevertheless, following the order of revocation and imposition of sentence on December 21, 2010, at no time did Hartsell seek leave to withdraw as Egan's attorney.  He continued to hold himself out to both Egan and the prosecutors as Egan's attorney in connection with Egan's attempt to negotiate a resolution to the charges then under investigation.

[3]  In *Kastigar v. United States*, 406 U.S. 441 (1972), the court held that when a defendant is cooperating with the government, he should be protected "against any disclosures which [he] reasonably believes could be used in a criminal prosecution or could lead to other evidence that might so be used." An agreement by the parties would "assur[e] that the compelled testimony can in no way lead to the infliction of criminal penalties."

to Hartsell for his approval. (#11-2 Exhibit B).  On January 4, 2011, Hartsell responded that the agreement "[l]ooks ok to me."  *Id.*  At this point, Egan had not seen the proposed plea agreement and had not spoken to Hartsell since the day of the revocation hearing.  SA McEwen attempted to contact Hartsell to determine whether  he intended to be present for the January 5, 2011 interview of Egan.  Receiving no response from Hartsell, McEwen sought assistance from Schiess, who was able to contact Hartsell.  Hartsell advised Schiess that he would not be going to the detention facility, and that the FBI was free to interview Egan without him being present.  Schiess so notified SA McEwen.

As planned, on January 5, 2011, SA McEwen and another FBI agent went to the federal detention facility in Pahrump to interview Egan.  Egan had not been advised as to when the interview would take place, and was surprised when the agents arrived.  At the outset of the interview, the agents informed Egan that Hartsell would not be there that day.  Both SA McEwen and Egan testified that no *Miranda* warnings were given.

At the hearing Egan acknowledged that the interview was conducted without hostility or confrontation.  He testified that the agents, who were unarmed; were polite, and treated him "like a human being."  Although the interview lasted more than five hours, Egan wasn't deprived of food or water.  Nor was he subjected to pressure to continue talking.  During the interview, Egan provided a considerable amount of information concerning his own illegal activities and the illegal activities of others.  Additionally, he signed a consent form allowing the agents to search an external hard-drive of his that was in the government's possession.  Following the interview, the FBI agents prepared a nine-page FD-302 report of the interview, dated January 6, 2011.  (#8-1). Egan testified that he was never told that he could enter into a *Kastigar* agreement for his protection, or even that there could be such an agreement.  Indeed, at no time prior to the proffer did Hartsell or anyone else insist or even suggest that Egan's proffer be subject to and protected by a *Kastigar* agreement.

Later in January, 2011, Hartsell mailed to Egan a copy of a proposed plea agreement.

5

Egan had concerns with certain of its provisions, and wanted to talk to his lawyer about it.  He and his wife tried to contact Hartsell, but Hartsell wouldn't accept collect calls from the jail and wouldn't return Ms. Egan's phone calls or messages.  Meanwhile, the  government also was attempting to reach Hartsell regarding the status of the agreement.  The government's inquiries began on January 14, 2011 (#11-3), and didn't end until April 18, 2011 (#11-7).  In Hartsell's responses to the government's e-mails, he indicated that he either couldn't go out to see Egan, was attempting to find time to see him to discuss the agreement (#11-4), or didn't know where Egan was being housed (#11-5).

During this period, Egan continued his effort to contact Hartsell, without success.  In order to prompt Hartsell to meet with his client, the government eventually arranged for Egan to be transported to a Las Vegas detention facility in April of 2011.  (#11-7).  Frustrated with Hartsell's unresponsiveness, the government contacted the court's CJA panel clerk, who arranged a hearing on April 26, 2011 before Magistrate Judge Peggy Leen.  The government informed Judge Leen that Hartsell's lack of communication with his client was preventing the parties from formalizing a pre-indictment plea agreement.  Egan told Judge Leen that Hartsell never responded when he tried to contact him, and that he (Egan) had "been in the dark since January."  Judge Leen called Hartsell's conduct "unacceptable," relieved him of his duties, and appointed Chris Rasmussen as Egan's lawyer.

The parties having failed since then to agree upon all the terms of the proposed plea agreement, the government sought and obtained an indictment against Egan on June 8, 2011.  *See* #1.  On June 20, 2011, Egan pled not guilty to all charges, and Rasmussen was appointed to represent him.  This motion followed.

## DISCUSSION

In his motion to suppress (#8), Egan contends that the statements he made during both the plea negotiations in the marshals' lock-up and the interview with the FBI agents should be suppressed.  Additionally, he argues that any evidence obtained through his consent to search

the hard-drive should be suppressed as well.  The government concedes that pursuant to Federal Rule of Evidence 410, it cannot use against Egan the statements he made during the plea negotiations in the lock-up. (#11).  Therefore, the issue before the court is whether the statements made during the lengthy FBI interview and any evidence obtained from a search of Egan's external hard drive should be suppressed.

In support of his motion, defendant argues that suppression is warranted because he was not *Mirandized* prior to his interrogation by the FBI agents.  He further contends that the statements he made during the interview with the agents were made involuntarily.  Finally, he contends that during the negotiations with the government that led to the lengthy proffer to the FBI agents his lawyer provided ineffective assistance of counsel that left Egan unprotected against self-incrimination during his proffer.

## A.  *Miranda* **Warnings**

A defendant is entitled to receive *Miranda* warnings once he has become the focus of a "custodial interrogation."  *Rhode Island v. Innis,* 446 U.S. 291, 297 (1980).  A custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).  However, in order for the *Miranda* requirement to be triggered for a person already in jail or prison, the defendant "must have been restricted in excess of the prison status quo: there must be 'some act which places further limitations on the prisoner.'" *Cervantes v. Walker,* 589 F.2d 424, 428 (9th Cir. 1978).  Thus, a person is not "in custody" for purposes of *Miranda* simply because he or she is in jail or prison. *United States v. Turner,* 28 F.3d 981, 983 (9th Cir. 1994).

The court looks to the "totality of the circumstances" when determining whether the prisoner was "in custody." *Walker,* 589 F.2d 424.  "[T]he language used to summon the individual, the physical surroundings of the interrogation, the extent to which he is confronted with evidence of his guilt, and the additional pressure exerted to detain him must be considered

1    to determine whether a reasonable person would believe there had been a restriction of his

2    freedom over and above that in his normal prison setting." *Id.* at 428.

3          At the hearing, Egan testified regarding the circumstances of the interview with the FBI

4    agents.  He admitted that he agreed to the interview beforehand, and that he actually wanted to

5    participate in the interview in hopes of securing a deal with the government.  Therefore, there

6    is no issue with the way he was summoned.  Further, there is no evidence indicating the physical

7    surroundings of the interview were in anyway more restricting than the surroundings in a

8    "normal prison setting." *Id.*  According to Egan, the interview was conducted in a room that

9    was normally utilized by attorneys to meet with their clients.  Although Egan did not leave the

10   room for more than five hours, he testified he didn't wish to leave, and even denied the meal

11   offered to him.  With regards to the "extent to which he [was] confronted with evidence of his

12   guilt," there is no evidence of any 'confrontation' of any sort by the agents.  Egan had already

13   engaged in plea negotiations with the government, therefore, the agents did not need to pressure

14   him regarding his guilt or innocence.  Additionally, there is no evidence to suggest that the

15   agents *accused* Egan of anything.  Rather, the record reflects that the agents asked him questions

16   relating to specific conduct and people involved in the crimes, and that Egan simply answered

17   their questions.  Lastly, Egan testified that there was no additional pressure placed upon him

18   during the interview, whether physical or psychological.  He acknowledged that he would have

19   been able to take a dinner or use the restroom if he had asked.  Thus, looking at the totality of

20   the circumstances, the court finds that Egan was not "in custody" for purposes of *Miranda,* and

21   his rights were not violated when Agent McEwen failed to read his *Miranda* warnings to him.

22   **B.     Voluntariness of Statements**

23         Involuntary statements are inherently untrustworthy, and in the end, "life and liberty can

24   be as much endangered from illegal methods used to convict those thought to be criminals as

25   from the actual criminals themselves."  *Spano v. New York,* 360 U.S. 315, 321 (1959).

26   Therefore, the actions of officers in obtaining confessions and information are subjected to

8

serious scrutiny. *Id.* The prosecution has the burden of demonstrating by a preponderance of the evidence that the statements were voluntary. *Missouri v. Seibert*, 542 U.S. 600 (2004). A statement is involuntary if it is coerced "by physical intimidation or psychological pressure." *Mickey v. Ayers,* 606 F.3d 1223, 1233 (9th Cir. 2010). In determining whether a statement is voluntary, the court looks at the "totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Id.* at 1233.

Here, the court finds that the statements made by defendant and the consent to search his hard-drive were voluntary. First, during the meeting at the lock-up on December 21, 2010, Egan agreed to be interviewed by the FBI agents as part of the process of arriving at a plea agreement. Despite not knowing exactly when the FBI agents would be arriving, he was aware of and consented to the upcoming interview. Second, the defendant testified that the interview was not hostile: the agents were unarmed and "very polite," the defendant was not deprived of any of his needs, and the agents never exerted any psychological or physical pressure against him to elicit information. Lastly, the defendant admitted that he signed the consent to search the hard-drive willingly, and that he wanted to cooperate in order to fulfill his part of the bargain. Thus, in view of the "totality of the circumstances," the court concludes that Egan's statements and consent to the search were voluntary.

## C.  Ineffective Assistance of Counsel

Egan contends that during the negotiations with the government in the marshals' lock-up and the lengthy proffer to the FBI agents that followed, Hartsell's performance as his attorney was so deficient that it amounted to no representation at all. More specifically, Egan contends that Hartsell's failure to secure a *Kastigar* letter prior to his client's lengthy proffer to the FBI amounted to ineffective assistance of counsel, and that but for such ineffective assistance, Egan would not have readily incriminated himself and agreed to hand over his external hard drive to the FBI. The question, then, is two-fold: whether by failing to secure *Kastigar* protection for his client prior to allowing him to make an incriminating proffer to the FBI, Hartsell provided

ineffective assistance of counsel at a critical pre-indictment stage of these proceedings; and, if so, whether Egan has an appropriate remedy at this time.

The right to the assistance of counsel is the right to *effective* assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 (1970). This right "extends to all critical stages of the criminal process," and "includes all circumstances in which certain rights might be sacrificed or lost, or where available defenses may be irretrievably lost." *United Sates v. Wilson*, 719 F.Supp.2d 1260, 1266 (D. Or. 2010) (quoting *Nunes v. Mueller,* 350 F.3d 1045, 1052 (9th Cir. 2003) and *United States v. Wade,* 388 U.S. 218, 225 (1967))(internal quotations omitted). Although the "Supreme Court has not squarely addressed whether a suspect-defendant has the right to effective assistance of counsel at a formal pre-indictment plea negotiation, courts have recognized that the Sixth Amendment can apply when the government's conduct occurs pre-indictment." *Wilson,* 719 F.Supp.2d at 1266. (internal quotations omitted). The court focuses on the nature of the pre-indictment confrontation to determine whether the government has shifted from "fact finder to adversary," and does not make a "mechanical inquiry into whether the government had formally obtained an indictment." *Id.* (quoting *Roberts v. Maine,* 48 F.3d 1287, 1291 (1st Cir. 1995) and *Patterson v. Illinois,* 487 U.S. 285, 298 (1988).

As an initial matter, the court finds that beginning on December 21, 2010, during the plea negotiations, the government in this case was no longer acting as a "fact-finder;" it had become an adversary and was targeting Egan for criminal prosecution. This plea negotiation stage was the "functional equivalent of the initiation of formal adversarial proceedings against" Egan. *Wilson,* 719 F.Supp.2d 1260. Thus, Egan's right to the assistance of counsel had attached, and he was entitled to *effective* assistance during this stage.

Although ineffective assistance of counsel claims normally deal with counsel's actions during a trial or while preparing for trial, "the same two-part standard [is] applicable to ineffective assistance claims arising out of the plea process." *Hill v. Lockhart,* 474 U.S. 52, 57 (1985). This two-part standard as articulated in *Strickland v. Washington,* 466 U.S. 668, 687-

688, 694 (1984), requires the defendant to demonstrate that (1) counsel's representation "fell below an objective standard of reasonableness," and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

Egan asserts that Hartsell's failure to secure a *Kastigar* agreement for the protection of his client and failure to accompany him during the interview with the FBI agents amount to ineffective assistance of counsel. (#8 and #16). Specifically, he argues that Hartsell's conduct was "so egregious," that the suppression of the statements made at the interview and any evidence stemming from the search of his hard-drive is warranted. In his Supplement (#16), he acknowledges that the issue of ineffectiveness of counsel asserted as a basis for pretrial suppression of evidence is a matter of first impression.

**1.    Deficiency of Representation**

As both the defendant and the government assert, there is no precedent that addresses whether the failure of defense counsel to secure *Kastigar* protection for his client amounts to deficient representation under the circumstances of this case. Nonetheless, in view of the importance of effective counsel during plea negotiations, and the fundamental protection afforded by a *Kastigar* agreement, the court finds that Hartsell's performance "fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687-688.

**a.    During Plea Negotiations**

In *United States v. Wilson*, 719 F.Supp.2d 1260, *supra*, the defendant contended that his attorney provided ineffective assistance during an effort to achieve a pre-indictment resolution of a case. The defendant complained that the attorney provided inaccurate advice regarding the potential sentence exposure, the likelihood of immunity, and whether to take the plea deal. The defendant had confessed to being involved in a drug conspiracy. He and his counsel met with the prosecutor to discuss a possible plea bargain. The government offered the defendant six years if he pled guilty and continued to cooperate. *Id.* at 1264. The government refused to produce discovery, and gave defendant one day to decide whether or not he was going to accept

the offer.  the defendant's attorney told him that he could not advise him to accept the offer without obtaining discovery, and that from his perspective, it appeared that the defendant had been promised immunity.  This assumption was not based on independent evidence; it was premised merely upon the defendant's subjective belief that he had been promised immunity. *Id.*

Thereafter, the defendant's counsel drafted a counter-proposal, whereby defendant would continue to cooperate with the government in exchange for full immunity.  The government rejected a pre-indictment resolution of the case that would involve immunity, and maintained the position it took in its first offer.  Without communicating this to Wilson, his counsel rejected the six-year offer.  *Id.*  The government did not re-extend its offer; instead it obtained an indictment against the defendant. *Id.* at 1265.  On the eve of trial, the government offered the defendant 188 to 235 months in exchange for a guilty plea.  The offer was rejected, and after trial, defendant was sentenced to 240 months in prison.  After the Ninth Circuit Court of Appeals affirmed the conviction and sentence, defendant filed a § 2255 motion, alleging ineffective assistance of counsel. *Id.*

Addressing whether defendant was entitled to counsel at a pre-indictment stage of the criminal process, the court noted that "the right to the effective assistance of counsel extends to 'all critical stages of the criminal process.'" *Id.* at 1266 (citing *Nunes v. Mueller*, 350 F.3d 1045, 1054 n. 6 (9th Cir. 2001)).  The court continued:

> A "critical stage" is any "trial-like confrontation, in which potential substantial prejudice to the defendant's rights inheres and in which counsel may help avoid that prejudice." *United States v. Leonti*, 326 F.3d 1111, 1117 (9th Cir. 2003).  It includes all circumstances in which "certain rights might be sacrificed or lost," or where "[a]vailable defenses may be irretrievably lost." *United States v. Wade*, 388 U.S. 218, 225 (1967).  The essence of a critical stage is "not its formal resemblance to a trial but the adversary nature of the proceeding, combined with the possibility that a defendant will be prejudiced in some significant way by the absence of counsel." *Leonti*, 326 F.3d at 1117.  In determining whether the right to counsel applies, "the test utilized by the Court has called for examination of the event in order to determine

1
2
3
4
5

whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *United States v. Ash*, 413 U.S. 300, 313 (1973).   Courts look to whether the prosecution "has committed itself to prosecute," and whether the "adverse positions of the government and defendant have solidified," such that the accused "finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

6 *Id.* at 1266-67.   In light of these principles, the court held that counsel "provided

7 unconstitutionally insufficient assistance when he refused to advise [defendant] of his available

8 options, and the possible consequences of rejecting the government's six-year offer." *Id.* at

9 1269 (citing *United States v. Blaylock,* 20 F.3d 1458, 1465 (9th Cir. 1994).   Specifically, the

10 court held that counsel should have "explained that [defendant] was facing a sentence

11 substantially larger than six years, and that acquittal was unlikely..." *Id.*   Further, the court held

12 that counsel's inaccurate advice regarding the sentencing calculations "undermined

13 [defendant's] ability to make a reasonably informed, intelligent decision about whether to

14 accept" the plea agreement. *Id.* at 1270.   The court concluded that there was "no evidence that

15 [counsel] ever provided [defendant] with an accurate assessment of his potential sentencing

16 exposure." *Id.*

17 Additionally, the court held that the "errors were compounded by [counsel's] grossly

18 inadequate advice regarding the likelihood of obtaining full immunity." *Id.*   Defense counsel

19 knew it was "highly unusual for a defendant to receive full immunity," and he should have

20 recognized that and explained it to the defendant. *Id.*   Lastly, the court addressed counsel's

21 failures with regards to the six-year plea offer. *Id.*   The court held that the acts of rejecting the

22 offer *without* the defendant's knowledge and continuing to insist on full immunity fell "below

23 an objective standard of reasonableness." *Id.*

24 The court found that but for the deficiency of counsel's representation, the defendant

25 would have accepted the government's six-year plea offer. *Id.* at 1273.   At the time of the

26 §2255 motion, defendant had already served seven years in prison. *Id.*   The court granted the

motion, released defendant, and gave him credit for the time served beyond six years. *Id.* at 1277. This case clearly demonstrates that counsel's failure to render proper advice to the client during pre-indictment plea negotiations can amount to ineffective assistance of counsel.

### b. *Kastigar* Agreement

In *Kastigar v. United States,* 406 U.S. 441 (1972), the Supreme Court recognized that defendants who have made self-incriminating statements while proffering information to the government in an effort to reach a plea agreement are entitled to "very substantial protection." The court held that a defendant should be protected "against any disclosures which [he] reasonably believes could be used in criminal prosecution or could lead to other evidence that might so be used." *Id.* at 445. Therefore, the court concluded that a defendant should be afforded protection by "assuring that the compelled testimony can in no way lead to the infliction of criminal penalties." *Id.* at 461. The government has the burden of proving that "all of the evidence it proposes to use was derived from legitimate independent sources" and not from the statements the defendant made during a proffer. *Id.* at 461–62.

Although *Kastigar* dealt with compelled testimony after a witness had asserted his Fifth Amendment privilege not to testify, the Ninth Circuit has recognized that there is no "constitutional distinction between compelled testimony given with a grant of statutory immunity and information given under an informal immunity agreement. *United States v. Dudden,* 65 F.3d 1461, 1468 (9th Cir. 1995) (citing *United States v. Camp,* 58 F.3d 491, 493 (9th Cir. 1995). A defendant need not assert his Fifth Amendment privilege in order to be afforded the protections granted by *Kastigar. Id.* Recognizing that these protections would greatly benefit their clients, defense attorneys can insist on an informal agreement whereby the government would grant immunity for incriminating statements given by defendants during a proffer. *Id.* ("When...the defendant has not been forced to testify and so has not claimed the Fifth Amendment privilege against self-incrimination, the government can grant the defendant varying degrees of immunity in an informal agreement.")(citing *United States v. Plummer,* 941

1   F.2d 799 (9th Cir. 1991).

2   Regardless of the type of immunity afforded, whether statutory or informal, the failure

3   timely to object at trial to evidence offered in violation of a *Kastigar* agreement can result in a

4   successful ineffective assistance of counsel claim *if* the defendant can demonstrate prejudice.

5   *United States v. Roca-Suarez,* 30 Fed. Appx. 723 (9th Cir. 2002).   If the failure to object to a

6   later use of evidence protected by an informal immunity agreement may be deemed to be

7   ineffective assistance of counsel, all the more ineffective is the assistance of an attorney who

8   fails to secure a *Kastigar* agreement in the first place.

9   **c.      Hartsell's Ineffective Assistance of Counsel**

10   Here, the question is whether Hartsell's pre-indictment performance "fell below an

11   objective standard of reasonableness." As in *Wilson,* Hartsell did not actively participate in the

12   negotiation process.  Even more egregious than counsel's conduct in *Wilson*, Hartsell allowed

13   his client to make incriminating statements during the proffer session with the FBI without

14   ensuring in advance that Egan was protected against self-incrimination.

15   The government contends that a *Kastigar* agreement was not required in this case

16   because the parties already "had a deal."  The court disagrees.  The parties had merely reached

17   an agreement as to the number of months of imprisonment the government would recommend.

18   That verbal agreement was not final; it was contingent upon Egan making a full and truthful

19   proffer.  No written agreement was ever signed; indeed, in the end Egan rejected the proposed

20   written plea agreement.

21   The court finds that Hartsell's failure to protect his client against self-incrimination by

22   requiring a *Kastigar* agreement prior to Egan's proffer "fell below an objective standard of

23   reasonableness." *Strickland,* 466 U.S. at 687-688.  In this court's view, a reasonably competent

24   criminal defense attorney would have understood the importance of a *Kastigar* agreement and

25   would have insured that such an agreement was in place before he allowed his client to make

26   a proffer to the FBI.   Hartsell's failure to do so amounts to a fundamentally deficient

15

1 performance.

2     The government argues that "Hartsell's performance is presumed to be the result of

3 sound trial strategy," *Strickland,* 466 U.S. at 689, and cannot be deemed ineffective. (#17). The

4 argument is misplaced.  Hartsell's failure to protect his client didn't occur at trial.  It occurred

5 at a time when the parties were negotiating a potential plea agreement in order to avoid a trial.

6 To allow a client to incriminate himself without protection can hardly, under any circumstance,

7 be characterized as a "sound trial strategy."

8     **2.**      **Prejudice to the Defendant**

9     In order to obtain relief, Egan must demonstrate not only that Hartsell's performance was

10 deficient, he must also show that there is a "reasonable probability that, but for counsel's

11 unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466

12 U.S. at 694.  The court finds that this element is easily satisfied.  The prejudice to Egan cannot

13 be clearer.  Had Hartsell secured a *Kastigar* agreement, and had the negotiations between the

14 parties subsequently broken down -- which they did -- Egan's self-incriminating statements and

15 external hard drive could not be used against him.

16     **3.**      **The Remedy**

17     In ineffective assistance cases, the remedy should "put the defendant back in the position

18 he would have been if the Sixth Amendment violation had not occurred." *Wilson,* at 1275

19 (quoting *Blaylock,* 20 F.3d at 1468).  Further, "[i]n choosing the proper remedy, a court must

20 consider the unique facts and circumstances of the particular case." *Wilson,* at 1275.  After

21 determining that defense counsel in *Wilson* was deficient, the court held that immediate release

22 was appropriate, as "nothing else [would] put petitioner back in the position he would have been

23 in, except for [counsel's] grossly ineffective assistance." *Id.* at 1276.  Here, the only remedy

24 that can be tailored to the particular circumstances of this case, so as to put Egan "back in the

25 position he would have been in" if not for counsel's inadequate performance, would be to

26 suppress the statements and any evidence obtained through the search. *Id.*

The government contends in its supplement (#17) that the defendant's motion is premature, and that matters relating to the ineffective assistance of counsel are more "properly raised after the adjudication of guilt." In the particular circumstances of this case the court disagrees. Typically, ineffective assistance claims concern counsel's performance at trial or in connection with sentencing. Resolution of the issue requires an examination of the trial and/or sentencing proceedings as a whole. Here, the focus of the claim is solely on the pre-indictment stage of the criminal process. There is no need to examine the transcript of a trial that has yet to take place. The ineffective assistance has already occurred and is clearly identified. The denial of effective assistance at this pretrial stage "may be more damaging than a denial of effective assistance at trial itself." *Wilson*, 719 F.Supp.2d 1260 (citing *Maine v. Moulton*, 474 U.S. 159, 170 (1985). An appropriate and complete remedy can be fashioned now. The "remedy for counsel's ineffective assistance should put the defendant back in the position he would have been in if the Sixth Amendment violation had not occurred." *United States v. Blaylock*, 20 F.3d 1458, 1468 (9th Cir. 1994). But for Hartsell's ineffective assistance, the government would not be able to use Egan's statements and external hard drive against him. Suppression is therefore the appropriate remedy.

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Defendant Egan's Motion to Suppress (#8) should be granted.

DATED this 26th day of September, 2011.

_____
**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**